```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
TIME WARNER CABLE, INC.,                 :
                      Plaintiff,         :
                                         :
                -v-                      :    09 Civ. 10059 (DLC)
                                         :
THE NETWORKS GROUP, LLC, TURNER MEDIA    :       OPINION
GROUP, INC., GARY TURNER, TELEVISUAL     :       AND ORDER
MEDIA WORKS, LLC, TELEVISUAL MEDIA       :
HOLDINGS LLC, TELEVISUAL MEDIA SERVICES  :
LLC, TELEVISUAL NET WORKS LLC,           :
TELEVISUAL AD WORKS LLC, and TELEVISUAL  :
DESIGN WORKS LLC,                        :
                                         :
                      Defendants.        :
----------------------------------------X
```

Appearances:

For the plaintiff:
Thomas E.L. Dewey
Stephen M. Kramarsky
Dewey Pegno & Kramarsky LLP
220 E. 42nd Street
New York, NY 10017

For the defendants:
Jeffrey E. Gross
Debra Kobrin Levy
Vandenberg & Feliu, LLP
60 E. 42nd Street, 51st Floor
New York, NY 10165

DENISE COTE, District Judge:

In this action, plaintiff Time Warner Cable, Inc. ("Time Warner") has sued The Networks Group, LLC ("Networks"), Turner Media Group, Inc. ("TMG"), Gary Turner ("Turner"), and six limited liability corporations that will be referred to as the

"Televisual Entities"[1] for, inter alia, breach of contract.  The complaint includes a breach of contract claim against Turner as an alter ego of TMG and Networks.  It also includes successor liability allegations against the Televisual Entities.  Turner and the Televisual Entities have moved to dismiss the complaint for failure to plead either alter ego status or successor liability adequately.  For the following reasons, the motion is denied.

BACKGROUND

A. The Programming Agreement

Networks, a company that the parties agree is "defunct" and "no longer operating," was in the business of providing transactional programming, which the plaintiff describes as television programming that includes infomercials, home shopping programming, and other similar content.  Networks is a wholly-owned subsidiary of TMG, which is similarly defunct.  Turner is or was, at all relevant times, CEO and Chairman of both Networks and TMG.  Turner and his wife, Staci Turner, each own 47.5% of TMG.  Turner's uncle, Dan Starr ("Starr"), owns the remaining five percent of the company.

---

[1] The Televisual Entities are:  Televisual Media Works, LLC ("Media Works"), Televisual Media Holdings LLC ("Media Holdings"), Televisual Media Services LLC ("Media Services"), Televisual Net Works LLC ("TNW"), Televisual Ad Works LLC ("Ad Works"), and Televisual Design Works LLC ("Design Works").

On June 26, 2006, Networks entered into a contract with Time Warner, a cable television company.  Under the terms of the Turner Media Group Master Transactional Programming Distribution Agreement ("Programming Agreement"), Networks agreed to pay Time Warner to distribute programming content provided by Networks via the cable systems Time Warner operated around the country.  Among the channels to be distributed pursuant to the Programming Agreement were "The Men's Outdoors and Recreation Channel" and "The Resort & Residence Channel."  TMG provided a "Provider Parent Guarantee" signed by Turner as CEO/Chairman of TMG, which guaranteed the performance of Networks' obligations under the Programming Agreement.  The Programming Agreement contains a choice of law provision selecting New York law and laying venue in a New York court.

Time Warner began to distribute Networks' content in June 2006, and sent monthly invoices of approximately $200,000 to Networks for payment.  Networks made only two payments before Time Warner ceased distributing its programming in August 2007.  In their answer to the amended complaint, Networks and TMG have admitted liability for breaching the Programming Agreement, disputing only the amount of damages.

B. The Short-Lived Bankruptcy Proceedings

On August 5, 2007, TMG and Networks, along with another company operated by Turner, filed for Chapter 11 bankruptcy in

Colorado.  Time Warner was involved in the jointly-administered proceedings as a creditor.  On August 27, Networks filed a motion to set aside the Programming Agreement.[2]  A short time later, the bankruptcy trustee filed a motion to dismiss the bankruptcy cases.  The ground for dismissal was that the bankrupt entities had chosen not to file documents that would have been necessary to cure deficiencies in their petitions.  The motion to dismiss was granted on September 4, and the bankruptcy cases were closed on October 4 without the motion to set aside the Programming Agreement having been decided and without discharging the companies' debts.

   C. The Televisual Entities

In late August 2007, Turner informed Time Warner's counsel in the bankruptcy proceedings that he would be starting a new programming company shortly.  Turner said that he planned to pay back Networks' debt to Time Warner in the hope that Time Warner would agree to do business with the new company.

In September and October 2007, Turner founded the six Televisual Entities.  The only individuals identified in the registration documents filed with the Secretaries of State as associated with the Televisual Entities are Turner, Staci Turner, and Kevin J. O'Toole ("O'Toole"), the individual who

---

[2] A bankruptcy trustee or debtor-in-possession may, subject to the court's approval, choose to assume or reject the debtor's executory contracts.  11 U.S.C. § 365(a).

4

acted as a registered agent for Networks and TMG.  Starr is alleged to own indirectly some stake in the Televisual Entities.  All of the Televisual Entities except Media Holdings[3] listed the same street address as TMG for their principal places of business in their registration documents, and later changed their addresses to the current address on file for Networks.[4]

The Televisual Entities produce lifestyle, entertainment and recreational cable channels.  According to its website, Media Works (one of the Televisual Entities) has "interests in a comprehensive suite of digital interactive television networks targeting specifically defined demographics highly sought after by advertisers and distributors."  The website explains that Media Works is owned by the founders of TMG.  Media Works'

---

[3] Media Holdings is the sole Televisual Entity registered as a Nevada LLC; the remainder are Colorado LLCs.

[4] The plaintiff alleges inconsistent facts regarding the principal places of business for Networks, TMG, and the Televisual Entities.  In the section of the complaint identifying each party to the action, the addresses given for the Televisual Entities' principal places of business do not match the address given for either TMG or Networks.  Later in the complaint, the plaintiff alleges that the Televisual Entities maintained the same principal place of business as TMG and Networks.  In its brief, the plaintiff explains that the addresses given for TMG and Networks in the first part of the complaint were the addresses associated with those entities pre-bankruptcy.  After they filed for bankruptcy, their addresses were changed.  Those post-bankruptcy addresses are the ones the plaintiff alleges they have in common with the Televisual Entities.

website describes the business of TNW, another of the Televisual Entities, as follows:

> TV Net Works owns and operates a portfolio of highly-targeted television channels that use a flexible format to reach specific demographics and viewer enthusiasts.  The networks combine targeted programming with interactive advertising and transactional shopping components, which allow viewers to request information, and get an in-depth look at products and services, all through their remote control.  TV Net Works' interactive channels begin launching in Q3 2009 and will reach over 50 million homes in 2010.

Among the channels available on TNW are the Men's Outdoors and Recreation Channel and the Resort & Residence Channel, two of the channels distributed by Time Warner for Networks under the Programming Agreement.

The complaint makes several allegations regarding Turner's role in the management of TMG, Networks, and the Televisual Entities.  The plaintiff alleges that, since 2001, Turner set up more than fifty limited liability companies or corporations under the names of Staci Turner, Starr, or O'Toole, all of which were mere shells and alter egos of Turner.  The complaint describes the Televisual Entities as part of this group of companies.  The plaintiff also alleges that Turner freely transferred substantial funds between TMG and the other companies and that TMG's profits, which should have been used to pay its creditors, were instead siphoned to these other shell

6

companies.  Time Warner alleges that Turner diverted these funds with the "intent of defeating rightful claims" of TMG's creditors.  The diversion of funds was ongoing during the period that TMG breached its guarantee of the Programming Agreement.

   D. Procedural History

   Time Warner filed its original complaint in this action against Networks, TMG, and Turner on December 8, 2009.  On February 26, 2010, Turner filed a motion to dismiss and to stay discovery.  At a pretrial conference on March 5, the plaintiff was given a final opportunity to amend its complaint.  On March 18, the plaintiff filed an amended complaint and added the Televisual Entities to the action.  On April 19, Turner and the Televisual Entities renewed the motion to dismiss and for a stay.  The motion was fully submitted on May 28.


                              DISCUSSION

  A. Turner's Motion to Dismiss

   Turner has moved to dismiss the complaint on the ground that the plaintiff has not stated a claim to pierce the corporate veil and find him personally liable for breaching the Programming Agreement.

      1.   Legal Standard on a Motion to Dismiss

   "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing

                                 7

that the pleader is entitled to relief.'"  Ashcroft v. Iqbal, 556 U.S. ___, 129 S.Ct. 1937, 1949 (2009).  This rule "does not require 'detailed factual allegations,'" id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)), but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Id. (quoting Twombly, 550 U.S. at 555); see also id. ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

A trial court considering a Rule 12(b)(6) motion "accepts all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's favor."  Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 91 (2d Cir. 2010).  To survive dismissal, "a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'"  Id. (quoting Twombly, 550 U.S. at 555).  In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 1949. Applying the plausibility standard is "a context-specific task

8

that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 1950.

    2.   Legal Standard for Piercing the Corporate Veil

The parties dispute which state's law should govern the veil-piercing claim.  In cases based on diversity jurisdiction, a court applies the law of the state in which the court sits, which in this case is New York.  Gerena v. Korb, ___ F.3d ___, No. 09-2594-CV, 2010 WL 2946852, at *6 (2d Cir. July 29, 2010). Under New York's choice of law principles, "the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) (citation omitted); Kalb, Voorhis & Co. v. Am. Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993) (disregarding the choice of law provision in a debenture).  But see Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 137 (2d Cir. 1991) (where both parties agree that a different state's law should apply, and that state's law on piercing the corporate veil is nearly identical to the law of the state of incorporation, the agreed-upon state's law may govern instead).

Networks and TMG were both incorporated in Colorado. Therefore, applying New York's choice of law rules, the law of Colorado governs the plaintiff's veil-piercing claim.  The plaintiff's argument that the law of New York should govern

9

because it was chosen by the parties to govern the Programming Agreement is rejected.

Under Colorado law, disregarding the corporate form to impose personal liability on a shareholder is appropriate when the corporation is "merely the alter ego of the shareholder and the corporate structure is used to perpetuate a wrong." In re Phillips, 139 P.3d 639, 644 (Colo. 2006) (citation omitted). Colorado courts consider three factors to determine whether to pierce the corporate veil.  The first is whether the corporate entity is the alter ego of the shareholder.  There are several non-exhaustive factors courts consider to determine this question:

> whether (1) the corporation is operated as a
> distinct business entity, (2) funds and
> assets are commingled, (3) adequate
> corporate records are maintained, (4) the
> nature and form of the entity's ownership
> and control facilitate misuse by an insider,
> (5) the business is thinly capitalized, (6)
> the corporation is used as a "mere shell,"
> (7) shareholders disregard legal
> formalities, and (8) corporate funds or
> assets are used for noncorporate purposes.

Id.  The second consideration is whether justice requires piercing the corporate veil "because the corporate fiction was used to perpetrate a fraud or defeat a rightful claim.  Only when the corporate form was used to shield a dominant shareholder's improprieties may the veil be pierced." Id. (citation omitted).  Third and finally, a court must determine

whether "an equitable result will be achieved" by disregarding the corporate form.  Id.

    3.    Pleading Standard for Piercing the Corporate Veil

Turner argues that the plaintiff's allegations in support of its effort to pierce the corporate veil must, but do not, satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b).  A veil-piercing claim, however, is governed by Rule 8's liberal pleading standard.  Int'l Controls Corp. v. Vesco, 490 F.2d 1334, 1351 (2d Cir. 1973); see also S. New England Tel. Co. v. Global NAPs, Inc., ___ F.3d ___, No. 08-4518-CV, 2010 WL 3325962, at *10 (2d Cir. Aug. 25, 2010) (affirming adequate pleading of alter ego status without mention of Fed. R. Civ. P. 9(b)).

The defendants argue that to the extent the plaintiff alleges fraud, Rule 9(b) applies.  They identify the plaintiff's allegation that Turner diverted funds from TMG "with the intent of defeating rightful claims" of TMG's creditors as one sounding in fraud.  Several district courts in this district have applied Rule 9(b) to claims to pierce the corporate veil that are based on a defendant's fraudulent conduct.  See, e.g., DirecTV Latin America LLC v. Park 610 LLC, 691 F. Supp. 2d 405, 432 (S.D.N.Y. 2010); In re Currency Conversion Antitrust Litig., 265 F. Supp. 2d 385, 425 (S.D.N.Y. 2003).  Until the Court of Appeals revisits its holding in International Controls, however, Rule 8

11

is the appropriate standard to weigh the sufficiency of the plaintiff's allegations to pierce the corporate veil.

    4.    The Sufficiency of Plaintiff's Veil-Piercing Allegations

Turner contends that the complaint does not plead a veil-piercing claim even when measured against the more liberal pleading requirements of Rule 8.  The complaint, however, contains sufficient non-conclusory allegations to survive the motion to dismiss.  In terms of the non-exhaustive factors considered by Colorado courts to assess alter ego status, the plaintiff has alleged facts that relate to at least four of the eight factors.  Specifically, Time Warner has alleged that Turner commingled funds and assets by siphoning profits from TMG to the other corporations and by transferring Networks' intellectual property to the Televisual Entities.  Moreover, the plaintiff alleges that Turner transferred the funds from TMG in order to render TMG judgment proof.  Finally, Turner's ownership and control of all of these entities with a small group of family and friends is alleged to have facilitated the misuse of the corporate form to defeat the rightful claims of TMG's creditors.[5]

---

[5] Time Warner also alleges that TMG and Networks were undercapitalized because they filed for bankruptcy.  Colorado law looks to whether a company was "set up in a manner so that it would be undercapitalized" rather than whether it became undercapitalized at any point in time.  Boughton v. Cotter

These allegations also address the second factor considered by Colorado courts, whether justice requires the piercing of the corporate veil due to a "dominant shareholder's improprieties." In re Phillips, 139 P.3d at 644. Alleging that the shareholder has abused the corporate form to defeat a creditor's rightful claim satisfies the second factor. Id. Finally, these allegations, if proved, are sufficient to show that piercing the corporate veil may assist in achieving equity. Equity may require that Turner be held accountable for his abuses of the corporate form that protected TMG's assets from its creditors and allowed him to jumpstart the Televisual Entities using the same intellectual property previously owned by Networks.

B. The Televisual Entities' Motion to Dismiss

The Televisual Entities have moved to dismiss on the grounds that there is no personal jurisdiction over them, or, if there is, that the plaintiff has failed to state a claim to impose successor liability.

1. Personal Jurisdiction

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." Penguin Grp. (USA) Inc. v.

---

Corp., 65 F.3d 823, 837 (10th Cir. 1995) (applying Colorado law to piercing the veil of a parent corporation to a subsidiary). Regardless, it is not necessary to allege undercapitalization to establish alter ego status. See, e.g., Harding v. Lucero, 721 P.2d 695, 698 (Colo. App. 1986).

13

American Buddha, 609 F.3d 30, 34-35 (2d Cir. 2010) (citation omitted).  Where, as here, there has been no discovery, the plaintiff need only make "legally sufficient allegations of jurisdiction" through its pleading and affidavits in order to survive a motion to dismiss.  Id. at 35 (citation omitted).

An allegation of successor liability against an entity whose predecessor is subject to personal jurisdiction can provide personal jurisdiction over the successor entity. Libutti v. United States, 178 F.3d 114, 124-25 (2d Cir. 1999) (discussing personal jurisdiction over successors-in-interest in the context of Fed. R. Civ. P. 25(c)).

> [I]t is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court.

Transfield ER Cape Ltd. v. Indus. Carriers, Inc., 571 F.3d 221, 224 (2d Cir. 2009) (quoting Patin v. Thoroughbred Power Boats, 294 F.3d 640, 653 (5th Cir. 2002)).

It is undisputed that TMG and Networks are subject to personal jurisdiction because they agreed to the forum selection clause in the Programming Agreement.  Because the plaintiff has stated a claim against the Televisual Entities for successor

liability, there is personal jurisdiction over the Televisual Entities.

2. Legal Standard for Successor Liability

Under New York law,[6] a corporation that acquires the assets of another is generally not liable for the seller's debts. Aguas Lenders Recovery Grp. v. Suez, S.A., 585 F.3d 696, 702 (2d Cir. 2009). New York recognizes four common law exceptions to this rule: "(1) a buyer who formally assumes a seller's debts; (2) transactions undertaken to defraud creditors; (3) a buyer who de facto merged with a seller; and (4) a buyer that is a mere continuation of a seller." Id. (citation omitted).

The plaintiff essentially argues that its complaint has pleaded a plausible claim that the Televisual Entities are successors of TMG and Networks either as a mere continuation of those companies or through a de facto merger. The de facto merger and continuation exceptions are so similar that some courts consider them as a single exception. See, e.g., Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 45 n.3 (2d Cir. 2003).

Under New York law, "[a] de facto merger occurs when a transaction, although not in form a merger, is in substance a

---

[6] The parties' briefs assume that New York substantive law governs the issue of successor liability. Such implied consent is sufficient to establish the applicable choice of law. See Arch Ins. Co. v. Precision Stone, Inc., 584 F.3d 33, 39 (2d Cir. 2009).

consolidation or merger of seller and purchaser." Id. at 45 (citation omitted). The hallmarks of a de facto merger are "(1) continuity of ownership; (2) cessation of ordinary business by the predecessor; (3) assumption by the successor of liabilities ordinarily necessary for continuation of the predecessor's business; and (4) continuity of management, personnel, physical location, assets, and general business operation." Nettis v. Levitt, 241 F.3d 186, 193-94 (2d Cir. 2001) (per curiam), overruled on other grounds by Slayton v. Am. Express Co., 460 F.3d 215 (2d Cir. 2006). See also Cargo Partner, 352 F.3d at 46 ("dissolution" as well as the "cessation of ordinary business" of the selling corporation as the second factor). "These factors are analyzed in a flexible manner that disregards mere questions of form and asks whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor." Nettis, 241 F.3d at 194. "The purpose of the doctrine of de facto merger is to avoid the patent injustice which might befall a party simply because a merger has been called something else." Cargo Partner, 352 F.3d at 46 (citation omitted). Moreover, "[n]ot all of these elements are necessary to find a de facto merger." Fitzgerald v. Fahnestock & Co., Inc., 730 N.Y.S.2d 70, 71 (App. Div. 1st Dep't 2001). While there must be continuity of ownership, because it is "the essence of a merger," New York v. Nat'l Serv. Indus., Inc., 460

F.3d 201, 211 (2d Cir. 2006), it is not necessary, for example, that the predecessor entity be dissolved.  Societe Anonyme Dauphitex v. Schoenfelder Corp., No. 07 Civ. 489, 2007 WL 3253592, at *4 (S.D.N.Y. Nov. 2, 2007); Holme v. Global Minerals & Metals Corp., 63 A.D.3d 417, 418 (N.Y. App. Div. 1st Dep't 2009).  "So long as the acquired corporation is shorn of its assets and has become, in essence, a shell, legal dissolution is not necessary before a finding of a de facto merger will be made."  Fitzgerald, 730 N.Y.S.2d at 72.

Time Warner has stated a claim for successor liability.  It has alleged three of the four hallmarks of a de facto merger.  The complaint alleges that the Televisual Entities have the same ownership, management, and physical location as Networks, as well as some of the same employees and assets.  It further alleges that the Televisual Entities continued the business operations of Networks by distributing the Resort & Residence Channel and Men's Outdoors and Recreation Channel.  The complaint further alleges that TMG and Networks are "defunct" and "no longer operating."  Indeed, the defendants concede that these two entities as "nothing more than carcasses" despite their continued existence as legal entities.  The continued legal existence of TMG and Networks is not a barrier to pleading a de facto merger.

17

The Televisual Entities make principally three arguments in support of their motion to dismiss. None of them is persuasive. First, they argue that neither the mere continuation nor the de facto merger exception can be established absent some type of corporate reorganization or other transaction that is not present here. They are mistaken. It is true that most cases discussing the exceptions to the general rule that successor entities are not liable for a predecessor's debts speak in terms of a "purchaser" and a "seller." See, e.g., Aguas Lenders, 585 F.3d at 702. At the same time, however, precedent emphasizes the acquisition of assets. "[W]hen a successor firm acquires substantially all of the predecessor's assets and carries on substantially all of the predecessor's operations, the successor may be held to have assumed its predecessor's liabilities, notwithstanding the traditional rule." Id. (citation omitted). The fact that the de facto merger exception is most often discussed in terms of a "transaction" that is the equivalent of a merger, Cargo Partner, 352 F.3d at 45, does not compel a different outcome. Rather, the absence of formalities is at the heart of the de facto merger exception, which is why a de facto merger is "analyzed in a flexible manner that disregards mere questions of form and asks whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor." Nettis, 241 F.3d at 194. The plaintiff

18

sufficiently pleads that Televisual Entities continue the operation of TMG and Networks.

The Televisual Entities next argue, relying on case law describing the continuation-of-operations exception, that the plaintiff cannot state a claim for successor liability because Networks and TMG continue to exist.  As described supra, more recent and persuasive New York case law finds that dissolution is not necessary to state a claim under the de facto merger theory.

Finally, the defendants argue that the Televisual Entities cannot be successors to TMG and Networks because Networks' channels ceased to be broadcast in August 2007 and the plaintiff does not allege that these channels resumed broadcasting until 2009.  They argue that this gap shows that the Televisual Entities did not assume Networks' liabilities under its contracts with distributors, one of the factors used to determine successor liability.  In light of the allegations of continued business operations and identical ownership and management, the existence of a gap in broadcasting does not defeat the pleading of successor liability.

CONCLUSION

The April 19 motion to dismiss and request for a stay of discovery are denied.

SO ORDERED:

Dated:   New York, New York
         September 9, 2010

                                     _____
                                        DENISE COTE
                                     United States District Judge